STATE v. THOMAS McNEILL.

*Indictment—Murder—Cooling Time—Character of Deceased.*

1. The doctrine of cooling time only applies when there has been legal provocation.

2. No words, however insulting, and no actions or gestures expressive of contempt, unaccompanied by indignity to the person, by a battery, or at least an assault, amount to a legal provocation so as to mitigate a slaying from murder to manslaughter.

3. Where a violent altercation in words had taken place between the prisoner and the deceased, and, after being separated for between five and ten minutes, they again came together, and, after angry and insulting words passed between them, prisoner shot the deceased, the killing is murder and not manslaughter.

4. The court is not bound to give an instruction in the words or in the order in which it is asked; it is sufficient if it is given in substance and in a proper connection in the charge.

5. The *general* rule is that evidence of the general reputation of the deceased as a violent and dangerous man is not admissible; to this rule there is a well defined exception that such evidence is admissible, when there is evidence tending to show that the killing may have been done in self-defence, or when the evidence is wholly circumstantial and the character of the transaction is in doubt. Wherefore there was no error in allowing the jury to consider the evidence in determining whether the prisoner acted in self-defence, but not on the question of manslaughter.

6. There was evidence tending to show that the prisoner was guilty of murder, and it was not error in the court to submit the case to the jury in that aspect.

(*State* v. *Merrill*, 2 Dev., 269; *State* v. *Banfield*, 8 Ired., 344; *State* v. *Carter*, 76 N. C., 20; *State* v. *Turpin*, 77 N. C., 473; *State* v. *Hogue*, 6 Jones, 381; *State* v. *Floyd*, 6 Jones, 392, cited and approved).

INDICTMENT for murder, tried at January Term, 1885, of the Superior Court of CUMBERLAND county, before *MacRae, Judge.*

The facts were as follows: The prisoner and deceased, who were half-brothers, were at a church festival at the house of Anthony Faulk on the 14th August, 1884. The house was situated in a field of 7 or 8 acres, with two lanes leading from it in different directions. The deceased came down inside one lane:

the prisoner and several others were standing on the outside. Deceased got on the fence, when the prisoner said, "where are you going, you G—d d—d son of a b—h?" Deceased got off the fence and said, "Tom, don't cuss me for that; I'm your brother." Prisoner repeated it. Deceased got off the fence and said, "If it wasn't for that, I've got a small little stick, I'd burst your head open." Deceased pulled up a little stake in the ground (they were then on same side of fence), and stepped back and said, "If you cuss me for that I'll burst you open." Geo. McFadyen got over the fence and told them to have no fuss. Prisoner said, "I'll shoot you," and pulled his pistol not quite out of his pocket. George McFadyen got between them, and pacified them, and they said they were done and walked off. The prisoner went into the house. Between five and ten minutes after the above occurrence, the deceased came out of the house with other persons and stopped in the lane between 25 and 40 yards from the house; he had a pocket-knife in his hand, picking his teeth, and was speaking of the fuss with the prisoner, and said he would have cut the prisoner, or would have whipped the prisoner, if he had not been his brother. Just then the prisoner came up and asked in an angry way what the deceased said. Deceased said, "I told you to stand off of me, Tom," and shoved prisoner back. One witness swore that the prisoner then said, "I'll shoot you, God damn you," and instantly fired. The deceased fell and died instantly. Other witnesses testified as to the shooting, but did not see the pushing or hear the words.

It was in evidence that the deceased was an older and stouter man than the prisoner and a better man in a fight, and that his reputation was that of a violent man. The killing occurred about three hours before day. Next morning, about 8 o'clock, the body was lying where deceased had fallen, and under the elbow of deceased his pocket-knife was found, open.

The prisoner's counsel asked the court to instruct the jury as follows:

1. "If the jury believe from the evidence that it was only five or ten minutes before the killing that there was an altercation between the prisoner and the deceased, in which angry words were used, and there was a demonstration of weapons, the deceased having picked up a stick, and the prisoner having attempted to draw his pistol, and both threatening to use their respective weapons on each other; then there was not sufficient cooling time to make the killing murder, but it would at most be only manslaughter.

2. If the deceased, at the time he shoved the prisoner, immediately before the killing, knew the prisoner was armed, and himself held an open knife in his hand, and was a more powerful man physically than the prisoner, then there was not such a disparity between them as would make the killing murder, but only manslaughter."

These instructions were refused by the Court.

3. "If at the time the prisoner shot the deceased he had reasonable cause to apprehend that the deceased was about to use his knife upon him, or shoved him in a manner which might reasonably have caused him to believe that he was about to receive some great bodily harm, then he would have had the right to shoot in self defence."

The Court, after instructing the jury as to some general legal principles as to which there is no exception, gave the third instruction as asked, and proceeded as follows:

"And it is in this view of the case that you may consider the testimony which has been offered you in regard to the relative size and strength of the prisoner and the deceased, as also the character for violence or otherwise of the deceased. If prisoner and deceased had had a previous difficulty and had made peace, and the prisoner soon afterwards, being armed with a pistol, sought the deceased for the purpose of getting into another difficulty with him, or of attacking him, and used words to him calculated and intended to bring on a blow, and upon being shoved by deceased immediately fired upon him and killed him, there

would be no circumstance of excuse or mitigation, and your verdict should be guilty of murder.

"There can be no manslaughter except upon legal provocation, and no words, however abusive or insulting, can amount to a legal provocation; it must be a blow, or at least an attempt or offer to strike, and the fatal blow must have been stricken upon this legal provocation, before cooling time has enabled the one to regain possession of his faculties of self-control. I feel bound to tell you that there is, according to the evidence, no such connection between the first difficulty and the subsequent killing as would of itself reduce the crime from murder to manslaughter, for if there had been legal provocation in the first difficulty, there had been a sufficient time to enable the prisoner to cool. If, however, the prisoner and deceased met, not by the seeking of the prisoner, and the prisoner heard the deceased talking about their former difficulty and cursed him, and thereupon the deceased, with a knife in his hand, seen by the prisoner, violently shoved the prisoner back, and the prisoner immediately drew his pistol, fired upon and killed deceased, this would not be murder, but the law would have respect to the passions of the prisoner and mitigate the crime from murder to manslaughter."

The jury returned their verdict, guilty of murder.

The prisoner excepted to the charge of the Court and moved for a new trial on grounds which are sufficiently stated and noticed in the opinion of the Court.

Rule for new trial discharged and judgment pronounced by the Court according to law.

Appeal by the prisoner.

*Attorney General*, for the State.
*Messrs. Z. B. Newton* and *W. A. Guthrie*, for the defendant.

MERRIMON, J. The Court very properly declined to give the jury the first special instruction prayed for by the prisoner. It was founded upon the groundless supposition that the deceased

had given him legal provocation in the first altercation between them. This he did not do, and hence, no question as to the cooling time was properly presented on the trial.

It appears from the testimony of Andrew Jones, one of the prisoner's own witnesses, and the one who testified most strongly for him, "that he was present at the commencement of the fray; deceased came down inside the lane; witness and several others and the prisoner were standing outside; deceased got on the fence; prisoner said, "where are you going, you G—d d——d son of a b——h;" deceased got off the fence and said, "Tom don't curse me for that; I'm your brother;" prisoner repeated it; deceased got down off the fence and said, "if it wasn't for that I've got a small little stick, I'd burst your heard open;" deceased pulled up a little stake in the ground, (they were now on the same side of the fence), and sorter stepped back and said, "if you curse me for that I'll burst you open." George McFadyen got over the fence and told them to have no fuss; prisoner said, " I'll shoot you," and pulled his pistol not quite out of his pocket; George carried deceased off; prisoner followed them, and returned to where they were standing."

If this evidence be accepted as true, it proves that the prisoner, without provocation, so far as appears, cursed the deceased in the most violent and insulting manner. The latter, at first, remonstrated with him in mild terms, reminding him of their close relationship, but heedless of this, he repeated the words of insult. The deceased then got a small stick and threatened to use it, if he cursed him. He did not strike, nor offer to strike the prisoner; his threat was accompanied with a condition, which, taken in connection with what he had just before said, plainly showed that he did not intend to strike the prisoner, unless he should further provoke him. The language of the prisoner was much the more insulting, and offered without any apparent cause; that of the deceased was likewise offensive, but he did not attempt or offer to strike the prisoner, and therefore gave him no legal provocation. Words of reproach and insult,

however grievous, do not make legal provocation, nor do indecent or provoking actions or gestures, expressive of contempt and reproach, unless accompanied with indignity to the person, as by a battery, or an assault at least. *State* v. *Merrill*, 2 Dev., 269; *State* v. *Barfield*, 8 Ired., 344; *State* v. *Carter*, 76 N. C., 20; *Foster's Criminal Law*, 290.

In this and like cases, the prisoner cannot successfully insist that he slew the deceased in the heat of blood, engendered in an altercation between them so recently before the slaying as that cooling-time had not intervened, unless it appear in such altercation that the parties fought, or that the deceased had at least given the prisoner legal provocation in some way. In the absence of such provocation, there is, in the eye of the law, no adequate cause for such furious state of mind of the prisoner and excessive heat of blood, as will mitigate the crime from murder to manslaughter. In such a case, there is no occasion for cooling time. When two persons quarrel, and each offers the other words of insult only, and they separate, and one shortly afterwards follows and slays the other with a deadly weapon, as a pistol, the slayer cannot be allowed to mitigate his offence by saying that he slew the deceased in the fury of passion and the heat of blood, occasioned by the words of insult so spoken to him.

The court is not bound to give a special instruction prayed for, the substance of which the prisoner may be entitled to have, in the very terms in which it is expressed, nor at the time, nor in the order it may be prayed for. If the substance of it shall be given in the course of the charge to the jury this will be sufficient. Indeed, in some cases, such instructions should not be given specifically. To do so, might give, or tend to give, undue prominence and weight to particular views of the evidence, or to particular facts, in the minds of the jury. The object of the court should be, in all cases, to direct the attention of the jury to every material aspect of the case, giving undue prominence to none, and to state clearly the law bearing upon each. Great injus-

tice might be done by giving a special prominence to particular facts, or views of the evidence.

It may be questioned, whether, in view of all the evidence and the bloody purpose manifested by him, the prisoner was entitled to have the benefit of the substance of the second special instruction he prayed for; but, if it be granted that he was, we think the court gave him the full benefit of it. In presenting the case to the jury in the aspect of manslaughter, the court said, " If, however, the prisoner and deceased met, not by the seeking of the prisoner, and the prisoner heard deceased talking about their former difficulty, and cursed him, and thereupon the deceased, with a knife in his hand, seen by the prisoner, violently shoved the prisoner back, and prisoner immediately drew his pistol, fired upon and killed deceased, this would not be murder, but the law would have respect to the passions of the prisoner, and mitigate the crime from murder to manslaughter," &c.

The view thus presented to the jury embraced every material fact that tended to mitigate the offence from murder to manslaughter; the court told the jury, in effect, that if they should find the facts to be as supposed, then the offence was but manslaughter, although the prisoner slew the deceased with a pistol, thus putting out of view any disparity between the slayer and the slain. The purpose of the instruction was to relieve the prisoner from the weight of the fact that he was armed with and used a very deadly weapon, a pistol. This the court did in full measure.

The exception based upon the ground that the Court instructed the jury that they might consider the relative size of the prisoner and the deceased each to the other, and the character of the latter in respect of violence, in determining whether or not the prisoner acted in self-defence, but did not extend this instruction so as to embrace the aspect of manslaughter, cannot be sustained. The size and character of the deceased, in the respect of violence, might tend to prove that the prisoner fought in self-defence; but this consideration could not tend to show that he slew the

deceased in a tempest of passion, or the heat of blood. Man-slaughter, in cases like this, is where the killing is sudden and in the heat of blood and furious passion, that suspends the reason. The prisoner has no time to think of the size of his adversary, or his character in respect of violence. Manslaughter excludes deliberation, preparation and orderly purpose. In *State* v. *Turpin*, 77 N. C., 473, the prisoner offered to prove the general character of the deceased as a violent and dangerous fighting man, and the question considered. was, whether or not this evidence, for this purpose, was admissible on the trial? In that case Justice By-num said, "The *general* rule prevailing in most of the American States is, that such evidence is not admissible, and in this State such a general rule is well established." He cites several cases and adds: "But these cases, which are cited as establishing a general rule excluding such evidence, admit that there may be exceptions to it, depending upon the peculiar circumstances of each case. And these exceptions themselves are now so well defined and established by the current of the more recent decis-ions, that they have assumed a *formula*, and have become a gen-eral rule subordinate to the principal rule. It is this: Evidence of the general character of the deceased as a violent and danger-ous man is admissible *when there is evidence tending to show that the killing may have been done from a principle of self-preserva-tion*, and also when the evidence is wholly circumstantial and the character of the transaction is in doubt." To the like effect is *State* v. *Hogue*, 6 Jones, 381. In *State* v. *Floyd*, 6 Jones, 392, the late Chief-Justice Pearson intimates that there may be a pos-sible case in which the prisoner, insisting that he was guilty of manslaughter only, might show the character of the deceased in respect of violence, with a view to explain how he came to be armed with and used such a dangerous weapon as a pistol or a bowie knife, but if in any possible class of cases such evidence could be admissible, this is not one of them.

The last exception in respect to that part of the charge pre-senting the case to the jury in the aspect of murder, upon the

ground that there was no evidence to support it, and therefore it misled the jury, is groundless. There was evidence, and strong evidence, if the jury believed it, going to show that the prisoner, still armed with a pistol, after the first altercation followed the deceased for the wicked purpose of renewing the quarrel and killing him if he should resist. If the facts were as the jury found them to be, the prisoner is guilty of murder, done under circumstances of savage ferocity. We look in vain for a fact that mitigates a crime so unnatural and so unusual.

The prisoner has no tenable grounds of complaint of the charge of the Court to the jury; it was intelligent and just and merciful to him. We have carefully examined and find no error in the record.

Let this opinion be certified to the Superior Court of Cumberland county, with instructions to proceed further in the action according to law.

No error.                                        Affirmed.