STATE v. J. P. HENSLEY.

*Jurors—Challenge to the Array—Evidence—Homicide—Murder.*

1. Where it appeared that the county commissioners had not revised the jury box at the last September meeting, and it also appeared that the jury boxes were not kept locked, and were kept in a place easily accessible to unauthorized persons ; *It was held,* no ground of challenge to the array, it not appearing that they had been tampered with.

2. The fact that one person drawn on the special *venire* was dead, and that another had removed from the county, before the time when the commissioners should have revised the jury list, is no ground for a challenge to the array.

3. A challenge to the array, must be for some cause which affects the integrity and fairness of the entire panel, as partiality or unfairness in the person whose duty it was to select the panel.

4. *Quœre,* whether a juror who has a bond to make title to him for a tract of land, on which he has made a payment, but a portion of the purchase money is still due, is a free-holder, so as to be competent to serve on the jury as a special *venire man.*

5. A reasonable number of jurors of any particular panel, may, in a capital felony, at the instance of the State, be required to stand aside, until all the other jurors of that panel shall have been called; but when all of the others have been called, the prisoner has the right to have the jurors so stood aside, tendered to him, or challenged by the State, before another *venire* is summoned.

6. The right to challenge jurors is for the purpose of obtaining a fair and impartial jury, and it was never intended by it to give either the prisoner or the State, the right to select certain men whom the party wishes to have as a juror.

7. So, where the Court allowed a challenge for cause to the State, to which the prisoner excepted, but a jury was obtained from the same panel, before the prisoner had exhausted his peremptory challenges ; *It was held,* that the exception as to the cause of challenge, would not be passed on in this Court, as it would be presumed that a fair and impartial jury was obtained, for if it had not have been, the prisoner would have exercised his right to peremptorily challenge the objectionable juror.

8. If, in such case, the original panel had been exhausted, and the jury completed from another, the prisoner would have been entitled to have the juror

STATE *v.* HENSLEY.

challenged by the State, tendered, and if the cause of challenge by the State
had been insufficient, it would have been error, entitling him to a new trial.

9. The prisoner however, is not entitled at all events to have every juror on the
panel, not challenged by the State, tendered, as this right is subject to proper
exception, such as that a juror of the panel has died, or failed to appear, or
has, for proper cause, been excused by the Court.

10. As a general rule, evidence is not admissible to show that the deceased was a
man of violent temper, and a dangerous man, because the law protects the
lives of violent men, as much so as those of a peaceable disposition, and evi-
dence is also generally incompetent to show that the deceased had threatened
the life of the prisoner.

11. The exceptions to these rules, are, 1st. When it appears that the killing was
done in self-defence. 2nd. If the evidence of the killing be wholly circum-
stantial, and the character of the slaying is in doubt, and to make such evi-
dence admissible in either case, it must appear that the prisoner knew of the
violent character of the deceased, and of the fact that the threats had been
made.

12. If the prisoner seek the deceased for the purpose of fighting with him, intend-
ing to kill him if he resists, and a fight ensues, and the prisoner slays the
deceased, it is murder, although deceased puts the prisoner in danger of his
life, during the fight.

13. So, if A assaults B first, and upon that assault, B assaulted A so fiercely as to
put A, the aggressor, in great peril of his life, and A kills B, this is murder,
and A cannot set up that he slew B in self-defence.

(*State* v. *Murphy*, 1 Winst., 120; *State* v. *Hagwood*, 73 N. C., 437; *State* v. *Martin*,
82 N. C., 672; *State* v. *Speaks*, 94 N. C., 865; *State* v. *Shaw*, 3 Ired., 532; *State* v.
*Arthur*, 2 Dev., 217; *State* v. *Benton*, 2 Dev. & Bat., 208; *State* v. *Lytle*, 5 Ired.,
58; *State* v. *Crayton*, 6 Ired., 144; *State* v. *Cockman*, 1 Winst., 484; *State* v. *Jones*,
88 N. C., 471; *State* v· *Washington*, 90 N. C. 664; *State* v. *Lilly*, 3 Ired., 424;
*State* v. *Scott*, 4 Ired., 409; *State* v. *Barfield*, 8 Ired., 344; *Bottoms* v. *Kent* 3 Jones,
154; *State* v. *Hogue*, 6 Jones, 381; *State* v. *Chavis*, 80 N. C., 353; *State* v. *McNeill*,
92 N. C., 812; *State* v. *Turpin*, 77 N. C., 473; *State* v. *Mathews*, 78 N. C., 523;
*State* v. *Hill*, 4 Dev. & Bat., 491; *State* v. *Martin*, 2 Ired., 101; *State* v. *Lane*, 4
Ired., 113; *State* v. *Brittain*, 89 N. C., 500, cited and approved).

INDICTMENT for murder, tried before *Gudger, Judge,* and a
jury, at the December Term, 1885, of the Superior Court of
BUNCOMBE county.

The prisoner was indicted for the murder of one Wm. G.
Haney.

On the calling of the special *venire,* which was drawn from
the jury box in accordance with the provisions of §1739 of The
Code, the prisoner challenged the array, and for cause of chal-

lenge showed, and the Court found the fact to be, that there was no revision of the jury list at the September meeting, 1885, of the Board of Commissioners of Buncombe county. That the last revision was in September, 1884, and that the jury box was not locked when it was brought into Court; that the jury boxes were kept in the office of the commissioners, and that other persons had access to this office; that the jury boxes were sometimes kept locked, and sometimes unlocked, and that when the Clerk of the Board went after them, for the purposes of this trial, they were unlocked. It was not suggested that any names were taken from, or added to, the names in the boxes.

The office where the boxes were kept, had been used at the November Term, 1885, of the United States District Court, by the Marshall of such Court, as a place to assemble the witnesses in attendance, in order to pay them off.

The challenge to the array was not allowed, and the prisoner excepted.

As a further challenge to the array, the prisoner alleged, and the Court found as a fact, that one Peter Redmond, who was drawn on the *venire,* was dead, and had died before the first day of September, 1885, and also, that one M. W. Reeves, who was also drawn, had removed from the county before the said last mentioned date. The Court further found, that when these names were drawn from the box, the sheriff stated that the one was dead, and the other a non-resident, and the Court asked the prisoner's counsel, if they had any suggestion to make, the Solicitor asking the Court to determine upon the facts of the matter at once. Counsel for the prisoner said that they had nothing to suggest, and the names were then put on the list.

This cause of challenge to the array was likewise overruled, and the prisoner excepted.

One J. B. Whitesides, being drawn from the *venire,* was challenged by the State for cause, and stated on his *voir dire,* that he owned no land, nor did his wife. That he had a bond to make title to him, for a lot of land, and had paid a portion of the pur-

chase money, and was to have a title made to him when he paid the residue. That he lived on the land, and paid the taxes on it. The Court held the cause of challenge good, and the prisoner excepted.

The special *venire* being exhausted, the Court ordered the sheriff to summon a *venire* of fifteen from the by-standers, to which the prisoner excepted.

While the Sheriff was summoning this additional *venire*, it was ascertained that four names drawn on the first *venire*, had accidentally dropped from the box. By consent, they were put back into the box, and the jury was completed from them.

When the jury was completed, the prisoner had not exhausted his peremptory challenges.

The evidence was in substance as follows:

John Lawson, a witness for the State, testified that he knew both the deceased and the prisoner. That on Monday, the 3d day of November, 1885, between 6 and 7 o'clock A. M., he went to Lawson's store, and found Haney, the deceased, E. Recton, Tom Harkins, and Charles Harrison, standing in front of the store. That after he had been there for three or four minutes, he saw the prisoner come out of a store on the opposite side of the street. That he locked the store door, and put the key in his pocket, and then started down the street towards where the witness and the deceased were standing. That the prisoner walked nearly opposite to where the deceased and the witness were standing, and then turned suddenly and crossed the street. When he stepped on the sidewalk, a few feet from the deceased, he said, "Good-morning, gentlemen," to which the deceased replied, "Good-morning, Jim." That the prisoner then said to the deceased, "Gray, what did you hit me for with that stick?" The deceased answered, "What did you follow me, and catch me, and jerk me around the way you did for?" The prisoner then said: "You called me a d—ned rascal." The deceased answered, "You called me that first." The prisoner then said, "Gray, you ought not to have hit me." To this the deceased replied: "I

know I ought not, Jim, and I am sorry that I did it, and I would not have done it for anything in the world;" and then added, "I haven't anything against you, Jim, and I don't want any fuss with you." That at this time, the deceased was standing on the sidewalk to the witness's right, and the prisoner to his left, and they were about six feet apart. After the deceased said, "I don't want any fuss with you, Jim," the prisoner stood about one minute, with both hands in his pockets, and then drew his right hand from his pocket and struck at the deceased, and said, "Take that, d—n you." That the prisoner could not reach the deceased with his fist, and witness did not see anything in his hand, but as the prisoner made the stroke, he heard some missile pass him, in the direction of the deceased. That the prisoner immediately put his hand into his hip pocket, and drew a pistol. That the witness caught the prisoner to prevent him from shooting, and in the struggle they both fell to their knees, and about that time the prisoner began shooting. That he fired two shots while the witness held him, and then got loose from the witness, and jumped about three steps from him, and fired the third shot, which inflicted the mortal wound. That as soon as this shot was fired, the prisoner ran, but was soon arrested.

The witness further testified, that during the conversation between the prisoner and the deceased, the deceased, who was a cripple, seemed frightened, and his voice trembled, but that the prisoner seemed cool, and showed no sign of agitation.

Charles Harrison, a witness for the State, testified to substantially the same facts as the witness Lawson, except that he saw the rock or other missile, which the prisoner threw at the deceased when he first struck at him. That when he threw the rock, he said: "D—n you, take that," and when he put his hand to his pocket to draw his pistol, he said: "D—n you, draw," or "D—n you, draw if you dare." That after the rock was thrown, the deceased took out his knife and attempted to open it, but it dropped to the ground, when he drew his pistol, which he held in both hands, pointed at the ground. Witness noticed the pris-

65

oner while Lawson was attempting to hold him, and saw him trying to present the pistol at the deceased, around Lawson's body.

There was evidence introduced, tending to show that the deceased and the prisoner had had a fight on the Saturday evening previous to the homicide on Monday, and that the deceased had sticken the prisoner, and drawn blood. There was also evidence that the prisoner said, just after this difficulty, that no man could draw his blood and live, and that he would kill the deceased, and that the fight was not over with yet.

There was conflicting evidence as to whether the deceased fired or not at the prisoner, some of the witnesses saying that he did, and others that he did not. There was also evidence tending to show, that the pistol found in the hands of the deceased, after his death, was not discharged, every chamber being loaded.

The other material facts are set out in the opinion.

There was a verdict of guilty of manslaughter, and from the judgment thereon, the defendant appealed.

*Attorney-General,* for the State.
*Mr. M. E. Carter,* for the defendant.

MERRIMON, J. The causes of challenge to the array assigned, were not such as entitled the prisoner to have the whole panel of the special *venire* quashed. It is true that the county commissioners were very negligent in failing to revise and correct the jury lists, and to place the names of all persons in the county, elligible to be jurors, in the jury box; and the chairman of the Board of Commissioners, the Clerk, and Sheriff, were equally negligent in respect to their respective duties as to the locking, custody, and safe-keeping of that box. Such neglect was highly culpable, and ought not to pass unnoticed by the proper authorities.

It is very important that the statutory regulations in respect to the selection of jurors, shall be faithfully observed. A due observance of them, greatly promotes the fair and intelligent

administration of public justice, and besides, the plain commands of a statute should never be neglected or disregarded by those charged with special duties. But important as such regulations are, they are regarded as only *directory*—they have never been treated as *mandatory*—and it is only strictly necessary that the persons summoned to be jurors, shall be elligible as such in other material respects. It is only essential to obtain a fair and impartial jury, composed of elligible men.

It was not suggested, nor did it appear, that any name of a person found in the jury box, was improperly placed in it, or that any name was improperly taken from it, nor did it appear at the time the challenges were made, that the prisoner might probably be prejudiced, nor does it appear that he was in fact, in any material respect or degree, prejudiced by reason of the irregularities complained of.

Nor was the fact that one of the persons named in the *venire*, had died before his name was drawn, and that another had left the county before his name was drawn, and before the jury lists should have been revised and corrected, good cause for such challenge. That the names of these persons were in the jury box, was probably owing to the failure of the county commissioners to correct the jury lists, and they were inadvertently placed in the writ of *venire facias*. That the names of two persons had been improperly placed in the special *venire*, was surely no just reason why the whole panel should be quashed. These names ought simply to have been struck from it, as having been improvidently placed there, and if it turned out, that a jury could not be obtained from the panel, the Court ought then to have ordered a second special *venire*, or the necessary additional jurors might have been obtained as allowed by law. The mere fact that the names of inelligible jurors, persons outside of the county, or persons dead, are named in the special *venire*, cannot destroy or impair the integrity of the whole panel, or in any way render it unlawful, and subject on that account, to challenge. Good cause of challenge to the array, must be such, as in contem-

plation of law, affects adversely, and renders ineligible the whole panel, as where the panel had been selected and arrayed by one or more persons, charged to select the jury, who were moved, or probably were moved, by partiality in selecting them, and the like causes. *State* v. *Murphy*, 1 Winst., 129; *State* v. *Haywood*, 73 N. C., 437; *State* v. *Martin*, 82 N. C., 632; *State* v. *Sparks*, *ante*, 865.

The State challenged a juror for cause, and the latter, on his *voir dire*, stated that he owned no land—that, however, he lived on a lot of land and paid taxes for it—that he had a bond for title thereto, the title to be made to him upon the payment of the purchase money, and he had paid only a portion of it. It was insisted by the Solicitor for the State, that this juror was not a freeholder in contemplation of the statute, and he was not, therefore, eligible. The Court sustained the challenge, and the prisoner excepted.

Whether or not the cause of challenge thus assigned was good, may be questioned, but we need not decide that it was or was not, because the prisoner, having the right to challenge twenty-three jurors peremptorily, so challenged only nineteen, and the jury was obtained from the panel of the special *venire*. This case is in this respect, materially different from that of *State* v. *Shaw*, 3 Ired., 532. In that case, the juror challenged was of the original panel, and when this panel was exhausted, and before calling any of the jurors of the special *venire*, the prisoner did not have opportunity to accept or reject the juror challenged, or discharged. No such question arises here.

It was in effect held, in *State* v. *Arthur*, 2 Dev., 217, and it has been uniformly so held in many subsequent cases, that a reasonable number of jurors of a particular panel may, at the instance of the State, be required to stand aside, until all the other jurors of that panel shall be called and accepted or rejected, and then the State must challenge for cause, or challenge peremptorily, if it shall not before that time have exhausted its right in this respect, the jurors so required to stand

aside. *State* v. *Benton*, 2 Dev. & Bat., 208; *State* v. *Lytle*, 5 Ired., 58; *State* v. *Craton*, 6 Ired., 164; *State* v. *Cockman*, 1 Winst., 484; *State* v. *Jones*, 88 N. C., 671. These, and other like cases, rest upon the ground, that the right of challenge is intended to secure a fair and impartial trial, and to that end, to exclude from the jury, persons objectionable for one or another just cause. It is no part of the purpose of the right of challenge, to afford the prisoner opportunity to select a particular juror or jurors, most likely to acquit, or to give him undue advantage. He has no right to select, and have his own choice of jurors; he has only the right to object to twenty-three, without assigning any cause, and indefinitely, for cause allowed by law to be good. His right is to have a jury, fair, impartial, and free from just exception, and when the jury is selected without objection, the prisoner having the right to object further, it must be presumed conclusively, that such a jury has been obtained. His failure to object further, when he could, is an implied admission—declaration—on his part, that the jury is a fair and unexceptionable one, though perhaps not his choice. This is such a jury as the law contemplates and requires.

We are not to be understood as saying, that the right of the prisoner to have the jury taken from a particular panel, if it shall not be properly exhausted before passing to a second, or another one, can be abridged. We do not so decide, but the contrary, and hence, if a juror of a particular panel were improperly rejected or made to stand aside at the instance of the State, and the prisoner did not have opportunity afforded him to accept, or challenge such juror for cause, or peremptorily, if his right in this respect had not been exhausted, this would be error, and upon exception properly taken, ground for a *venire de novo*. The reason for this rule seems to be, that the prisoner has had opportunity allowed by the law to make proper inquiry, and consider the fitness, or want of fitness of the jurors composing the panel, and this may be of just advantage to him in obtaining an unobjectionable jury. *State* v. *Shaw*, *supra*; *State* v. *Washington*, 90 N. C., 664.

The prisoner is not, however, entitled at all events, to accept or challenge every juror named in the particular panel, not challenged peremptorily, or successfully for cause by the State. This right is subject to proper exception, such as that a juror had died, or had failed to appear, or where the Court, for any reasonable cause, had discharged one or more.

In this case, the prisoner was not entitled to have the particular juror, who was successfully challenged by the State, nor to select a jury of his own choice—he only had the right, as we have seen, to except to objectionable jurors, and to have an unobjectionable jury. The conclusive presumption is, that such a jury was obtained, because, the prisoner accepted jurors of the panel tendered, until the jury was completed, while he yet had the right to challenge four peremptorily. If one or more were not acceptable to him, it was his fault that he did not exercise his right to object. Obviously he might have done so. So that, whether the challenge of the State complained of was properly or improperly allowed, an unexceptionable and lawful jury was obtained. That the challenge was allowed presently when made, instead of directing the juror to stand aside until all the other jurors of the panel had been called and accepted or rejected, cannot alter the case, because an unobjectionable jury was obtained, and the contingency in which the prisoner had the right to have him tendered, did not arise. The exception cannot, therefore, be sustained.

Evidence was offered by the prisoner and received, tending to prove that the deceased was a violent, quick-tempered man; that he frequently engaged in brawls, and resorted to deadly weapons, but this evidence was quite conflicting, and the weight of it tended mainly to show, that he was quarrelsome when excited by spiritous liquors. The prisoner also offered to show by the witness, that the deceased, on the day before the homicide, said to the witness, that he —Haney—or Hensley "had to die before the election was over." This was not communicated to the prisoner. The Court declined to receive such evidence, and the prisoner assigns this as error.

Generally, evidence to prove that the deceased was a person of bad temper, quarrelsome, violent and savage in his nature and habits, is inadmissible, upon the ground that the law no more allows the life of such person to be taken unlawfully, than that of the best of men. Its protecting arm extends to, and embraces all classes and conditions of men, without regard to their imperfections and infirmities, except in possible cases of outlawry. Such evidence ordinarily is irrelevant—does not tend to prove the issue, and might—generally would—mislead the jury to the prejudice of the prosecution. And evidence of threats of the deceased, are for like reasons, generally inadmissible. The mere fact that he made threats against the prisoner, could not justify the latter in taking his life. And especially, such evidence would not be admissible, when the prisoner is guilty of manslaughter or murder, for in no case can the prisoner be excused for committing the latter crime, nor can he be justified in voluntarily engaging in mutual combat with the deceased, and slaying him, although the law, in the latter case, pays such regard to the frailty of his nature, as to mitigate the killing to the offence denominated voluntary manslaughter. When the slaying is done with a felonious intent, evidence of the character of the deceased, and threats made by him, is not material, and is therefore inadmissible. *State* v. *Lilly*, 3 Ired., 424; *State* v. *Scott*, 4 Ired., 409; *State* v. *Barfield*, 8 Ired., 344; *Bottoms* v. *Kent*, 3 Jones, 154; *State* v. *Hogue*, 6 Jones, 381; *State* v. *Chavis*, 80 N. C., 353; *State* v. *McNeill*, 92 N. C., 812; Wh. Am. Cr. L., 296; Wh. Am. Law. of Hom., §217 *et seq.*, to §249.

But there are exceptions to the general rule of law just stated, applicable to cases peculiar in the facts and circumstances attending them: First, if it appears from the evidence, that the prisoner may have slain the deceased in order to save his own life, or himself from enormous bodily harm or peril, and it is doubtful whether the killing was excusable homicide or manslaughter, it is then competent to give evidence of the violent and dangerous character of the deceased, and that he made threats against

the prisoner; if the latter had knowledge of such character and threats. Second, if the evidence, in respect to the homicide, tending to prove the guilt of the prisoner, is wholly circumstantial, and the character of the slaying is in doubt, such evidence will be competent.

In cases embraced by these exceptions, evidence of the violent and dangerous character of the deceased, and his threats, tends to remove the doubt. Such facts are some evidence, to be taken in connection with other evidence, tending to prove that the prisoner fought in defence of his life, or to save himself from enormous bodily harm, and that he did no more than the law allowed him to do, in view of the peril he encountered. In the absence of positive evidence, it is not an unreasonable inference, that the prisoner did not seek, attack, and slay the deceased, a violent and dangerous man, who had made threats against him, without just and adequate cause. The object of such evidence, is to let the jury see, as nearly as may be, all the facts attending the homicide, and the considerations that most likely at first deterred the prisoner from attacking, and at last drove him, when himself was attacked by the deceased, to slay him. But if the prisoner did not have knowledge of such character of the deceased, then such evidence would not be competent, because it could not be inferred, that he acted upon facts of which he was ignorant.

And so also, if the evidence as to the facts and circumstances of the homicide, are altogether circumstantial, and leave the character of the offence in doubt, then such evidence is admissible, and for the reasons already stated. The Court must determine when such evidence is admissible. *State* v. *Turpin,* 77 N. C., 473; *State* v. *Mathews,* 78 N. C., 523; *State* v. *McNeil, supra; Pritchet* v. *The State,* 22 Ala., 39; *Monroe* v. *The State,* 5 Ga., 85; Hor. & Thomp., Self Defence Cases, under the heads, "Character of the deceased for violence," 949, and "Threats," 987.

The evidence in this case, does not bring it within either of the exceptions stated above. The deceased did not seek and attack the prisoner, or offer to do so, and thus render it necessary for the latter to kill him, in order to save his own life, or to prevent enormous bodily harm to himself; nor was the evidence as to the homicide circumstantial, nor was the character of the offence left in doubt. On the contrary, the whole of the evidence as to the slaying, was positive, and the prisoner himself sought the deceased, insulted and assaulted him, in a fierce and violent manner, in the presence of several reputable persons.

It is our duty to examine and consider the evidence, sent up as part of the case stated on appeal, in order to determine the merits of the alleged errors assigned, and we have done so, with that earnest care, the gravity of the case requires. Viewing the whole of it in the most favorable light for the prisoner, we cannot hesitate to conclude, that he was at least guilty of manslaughter.

Several witnesses, who were immediately present at, and saw the homicide, and all that was then done by the prisoner and the deceased, and heard what each of them said to the other in that connection, gave substantially the same account of what was said and done. These witnesses were not contradicted in any material respect; they were unimpeached, and there was evidence of their reputable character.

It appears, that on a Saturday night, the deceased and the prisoner quarreled and fought, and as a result, the latter bled freely from a slight wound. That night, he sought and failed to obtain revenge, but made threats then and the next day, that he would have it. On the next Monday morning, about the hour of six or seven o'clock, the deceased and some other persons, were standing on the sidewalk of a public street, in front of a store. The prisoner was seen to come to the door of a store, thirty-five or forty yards distant from them, and look towards them. He immediately retired from the door out of sight—he soon reappeared, came out of the store, and closed the door. Then,

with one hand in his pocket, he walked down the street, to a point nearly opposite to the place where the deceased and the other persons with him were standing—he then turned suddenly and crossed the street, and as he stepped on the sidewalk, a few feet from the deceased, he said, "good morning gentlemen." This salutation was returned by several of the party, the deceased saying "good morning Jim." The prisoner then said, it seems at once, to the deceased, "Gray, what did you hit me for with that stick?" The deceased replied, "what did you follow me, and catch me and jerk me around, the way you did, for?" The prisoner said, "you called me a d—d rascal"—deceased said, "you called me that first." Prisoner said in reply, "Gray, you ought not to have struck me." Deceased said, "I know I ought not, Jim, and I am sorry I did, and I would not have done it for anything in the world, I haven't anything against you Jim, and don't want any fuss with you." Another version of this colloquy is, that the prisoner said, "Gray, what did you hit me with that stick for Saturday night?" Deceased said he was sorry he had done it, and hated he had done so, and would not do it again for the world. Prisoner and deceased were about six feet apart, a person standing between them. Deceased was lame in one leg, and his voice trembled, as if he were excited by fear—he seemed frightened. The prisoner said, "Yes, by G—d, I guess you are sorry," jerked his hand out of his pocket, and threw a stone or some other missile, violently at deceased, missing him, saying, "take that, damn you," or, "damn you, take that." The deceased was seen, just at that time, to put his hand to. his pocket. The prisoner at once put his hand to his hip pocket, and drew a pistol, saying to deceased, "damn you, draw it," or, "draw if you dare." Deceased at first drew a small knife from his pocket; tried to open it, but it fell from his hands to the ground. He also drew a pistol, and endeavored to use it, holding it in both hands. It is not certain that he fired it at all. It may be that he fired it once. As to

this, the evidence is conflicting. A witness, seeing the prisoner about to fire his pistol, seized him, trying to prevent him from doing so, and the two, in the struggle, came to their knees, the prisoner endeavoring all the while to shoot the deceased, and firing two shots. At last, wrenching himself loose from the witness, he stepped off the sidewalk into the street, and fired the fatal shot, the deceased falling to the ground. As the prisoner turned to get away, another of his shots went into the ground.

Now, if the prisoner sought the deceased for the purpose of revenge, and brought on the combat, intending to kill him if he resisted, and he did kill him, then he was guilty of murder, notwithstanding he may have encountered great peril from the deceased, because, in that case, the slaying was attributable to the preconceived malice. *State* v. *Hill*, 4 Dev. & Bat., 491; *State* v. *Martin*, 2 Ired., 101; *State* v. *Lane*, 4 Ired., 113; *State* v. *Hogue*, 6 Jones, 381.

Manifestly, there was evidence of such purpose. The prisoner was sorely dissatisfied with the result of the fight of the Saturday night previous—the loss of blood galled him—he repeatedly declared his purpose to have blood and revenge for the insult and injury done him. Armed with a pistol and a missile of some sort, he sought the deceased, cursed and insulted him grossly, and threw at him violently the missile he had concealed in his pocket, notwithstanding the ample and submissive apology of the deceased. Seeing the latter about to put himself on the defensive, or resent the insult offered him, he drew his pistol, and challenged the deceased defiantly to draw his weapon. The meaning of this conduct on his part, in the light of other surrounding facts, could scarcely be mistaken. It is plain that the jury might not unreasonably have rendered a verdict of guilty of murder; but they mercifully rendered that of manslaughter.

In no possible, just, and reasonable view of the evidence, can it be contended, that the prisoner fought *se defendendo*. Armed, he deliberately went to where the deceased was, brought on and

began the rencounter, under circumstances that plainly indicated his unlawful and criminal, if not as well, his bloody purpose. The fact that a bystander seized and endeavored unsuccessfully to prevent him from using his pistol, could not excuse him from the guilt of manslaughter, even if such interference increased his peril, and thus rendered it necessary for him to kill the deceased, in order to save himself, because he unlawfully and criminally provoked and began the combat, and he cannot be be allowed to take advantage of his own wrong, and take shelter behind his own lawless conduct. It is said by Lord Hale, that "if A. assaults B. first, and upon that assault, B. re-assaults A., and that so fiercely, that A. cannot retreat to the wall or other *non ultra*, without danger of his life, and then A kills B, this shall not be interpreted to be *se defendendo*, but to be murder, or simple homicide, according to the circumstances of the case; for otherwise, we should have all the cases of murder or manslaughter, by way of interpretation, turned into *se defendendo*. The party assaulted indeed, shall, by favorable interpretation of the law, have the advantage of this necessity, to be interpreted as a flight, to give him the advantage of *se defendendo*, when the necessity put upon him by the assailant, makes his flight impossible; but he that first assaulted, hath done the first wrong, and brought upon himself this necessity, and shall not have advantage of his own wrong, to gain the favorable interpretation of the law, that that necessity which he brought on himself, should, by way of interpretation, be accounted as a flight, to save himself from the guilt of murder or manslaughter." 1 Hale Pl. Cr., 482.

On the same subject, Sergeant Hawkins says: "Neither shall a man, in any case, justify the killing of another, by pretence of necessity, unless he were himself wholly without fault in bringing that necessity upon himself; for if a man, in defence of an injury done by himself, kill any person whatsoever, he is guilty of manslaughter at least; as where divers rioters wrongfully detain a house by force, and kill those who attack it from with-

out, and endeavor to re-take it." 1 Hawk. Pl. Cr., 82, 83. *State* v. *Brittain*, 89 N. C., 500; *Adams* v. *The People*, 47 Ill., 376; *Stancifer's case*, 6 Cal., 407; *State* v. *Linney*, 51 Mo., 40; *Vaiden* v. *Commonwealth*, 12 Grat., 717; Hor. & Thomp. Cases on Self-defence, 985.

But if such excuse could in any possible case be allowed, it could not in this. It is by no means certain that the prisoner's peril was at all increased by the interference of the by-stander, to prevent him from using the pistol. While the struggle continued, he manifested not the slightest disposition to desist from the fight, or act upon the defensive—on the contrary, while it continued, he manifested the fierce purpose to persist in the combat, and twice fired his pistol at the deceased, missing him. And as soon as he freed himself from restraint, instead of retreating, or showing the slightest disposition to do so, he stepped off the side-walk into the street, and fired the fatal shot. Besides, at no time during the deadly struggle, did the deceased act in such a bold, fearless and determined manner, as to place the prisoner in great, much less extreme, peril. He was lame in one of his legs—he seemed from the first to be alarmed, and anxious to avoid a conflict. When the missile was thrown at him, he at first took his knife from his pocket—could not open it, and it fell to the ground—he promptly then drew his pistol, and held it awkwardly in both hands. It is doubtful whether he discharged it at all—he certainly did not more than once, and without effect. He accomplished in the fight nothing—did not touch the prisoner. A dangerous antagonist, would have discharged every chamber of the pistol at his adversary under such circumstances.

There is no reasonable ground—not the slightest—for insisting that the prisoner's case should be treated as if he had abandoned the fight, fled to the wall, and slain the deceased to save his own life, or himself from great bodily harm. If he was not guilty of murder, it is much clearer, that he cannot be heard to insist that he fought *se defendendo*.

In each of the special instructions asked for by the prisoner, the Court was requested to tell the jury, that if they should find the facts to be as therein suggested, then they should render a verdict of not guilty. We have seen, that the evidence did not, in any aspect of it, warrant such instructions. The Court ought not to have given the two instructions granted, and it properly denied the others.

There are several other exceptions specified in the record, which the counsel for the prisoner submitted without argument. Upon a careful examination of them, we find them without merit, and we do not deem it necessary to advert to them, further than to say that they cannot be sustained.

The action of the Court and jury towards the prisoner, in the discharge of their respective duties, was beneficent and merciful, and he has no just or reasonable ground of complaint at it.

There is no error. Let this opinion be certified to the Superior Court, to the end that that Court may proceed to enter judgment according to law. It is so ordered.

No error.　　　　　　　　　　　　　　　　　　　Affirmed.